UNITED STATES, Appellee

v.

John A. ALBRECHT, Airman First Class,
U.S. Air Force, Appellant.

No. 94–0510.
CMR No. 29749.

U.S. Court of Appeals for
the Armed Forces.

Argued March 7, 1995.

Decided Sept. 27, 1995.

For Appellant: *Colonel Jay L. Cohen* (argued); *Captain Joel R. Reifman* (on brief); *Captain Jeffrey B. Miller* (USAFR).

For Appellee: *Colonel Jeffery T. Infelise* (argued); *Captain Jane M.E. Peterson* (on brief); *Major John H. Kongable.*

*Opinion of the Court*

WISS, Judge:

1. Upon provident pleas of guilty, a general court-martial composed of a military judge alone convicted appellant of stealing personal checks, falsely making the stolen checks payable to himself, and knowingly uttering those falsely made checks to the credit union (2 specifications each), in violation of Articles 121 and 123, Uniform Code of Military Justice, 10 USC §§ 921 and 923, respectively. The military judge sentenced appellant to a bad-conduct discharge, confinement for 8 months, and reduction to the

lowest enlisted grade. The convening authority approved these results, and the Court of Military Review[1] affirmed them by a divided vote. 38 MJ 627 (1993).

■ 2. On appellant's petition, this Court granted review of the following issue:

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED (CHIEF JUDGE DIXON DISSENTING) BY MISAPPLYING *UNITED STATES V. TETERS* AND HOLDING THAT TWO SPECIFICATIONS OF FORGING CHECKS BY MAKING UNDER ARTICLE 123, UCMJ, AND TWO SPECIFICATIONS OF FORGING THE SAME CHECKS IN THE SAME TIME AND PLACE BY UTTERING UNDER ARTICLE 123, UCMJ, WERE NOT MULTIPLICIOUS FOR FINDINGS.

We hold that the court below did not err.

## I

3. A stipulation of fact, admitted in support of the tendered pleas, indicates that appellant stole three checks each from Sergeant Scott Robinson and Airman First Class Joseph Dicesare. They had presigned personal checks and had entrusted them to friends to pay their bills while they were deployed in Operation Desert Shield/Desert Storm. Appellant wrote his name as payee and the payable amount on each of the six checks and uttered them at the local credit union. The total proceeds were $480.00.

4. The Government charged the larceny of Robinson's checks and the larceny of Dicesare's checks in two separate specifications. Also, it charged appellant with making Robinson's three checks and with uttering those three checks in separate specifications (specifications 1 and 2 of Charge II), and it treated the making and uttering of Dicesare's three checks similarly (specifications 3 and 4 of Charge II).

5. During the providence inquiry, appellant acknowledged that, when he stole the checks, he "intended to use them to write values to them." Appellant explained his

falsely making the first three checks as follows:

Between 4 February 1991 and 25 February 1991, I made three writings upon checks I had previously taken from SSgt Scott Robinson. That is, I wrote my name on the checks where it states "pay to the order of." I knew that these writings if genuine, would impose a legal liability upon SSgt Robinson when they were uttered, which I intended to do. When I filled my name in on these checks, I did so with the intent to defraud, that is to obtain something of value by misrepresenting Scott Robinson—while misrepresenting SSgt Robinson had written them to me.

Appellant continued, explaining his having uttered those three checks:

Between 4 February 1991 and 25 February 1991, I made three writings, that is I wrote my name as payee upon checks I had previously taken from SSgt Scott Robinson. I knew that these writings, if genuine, would impose legal liability upon SSgt Scott Robinson when they were uttered. I subsequently uttered these checks to the Eglin Federal Credit Union. When I uttered these checks, I was aware that I had falsely made myself as payee on the checks, but nonetheless uttered them to obtain something of value through misrepresentation.

Appellant similarly explained the circumstances involving Dicesare's three checks. Responding to inquiry from the military judge, appellant indicated that, as to each of the six checks, he made the check and then took it to the credit union and uttered it on "the same day."

6. After the military judge had entered findings of guilty and had heard relevant sentencing evidence, he granted a contested defense motion to treat each making as multiplicious for sentencing purposes with each uttering. The defense, however, made no trial motion that contended there was multiplicity for findings.

7. Notwithstanding, appellant urged in the Court of Military Review that each making and each uttering together constitutes

1. *See* 41 MJ 213, 229 n. * (1994).

only one crime of forgery under the UCMJ. A majority of that court, with Chief Judge Dixon dissenting in part, rebuffed him, relying on the rationale of *United States v. Teters*, 37 MJ 370 (CMA 1993), *cert. denied*, — U.S. ——, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994); and he has renewed his claim before us.

## II

8. Both the majority and the partial dissenter in the Court of Military Review recognized that, in *Teters*, this Court articulated the controlling standard generally applicable to determine whether two specifications are multiplicious. As Chief Judge Dixon put it:

In *Teters*, our highest appellate court recognizes the constitutional power of Congress to define Federal military offenses and prescribe their punishments. Abandoning prior precedent, it adopts the intent of Congress as the controlling factor for determining whether a military accused may receive multiple convictions and punishments for the same act or course of conduct. When separate statutes are involved, *Teters* notes that the Supreme Court uses the rule of construction found in *Blockburger v. United States*, 284 U.S. 299, [304,] 52 S.Ct. 180, [182,] 76 L.Ed. 306 [,309] (1932), to discern congressional intent.

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional[2] fact which the other does not.

38 MJ at 631.

9. Thus, the key to a question of multiplicity is the oft-sought-after but frequently elusive intent of Congress. *United States v. Teters, supra* at 376–77. Where Congress somehow has expressed its intent in this regard, the question easily is answered. Where Congress has not expressly done so, however, we invoke certain logical assumptions in order to infer it.

10. We begin by assuming that Congress "does not intend to [twice] punish the same offense under two different statutes." *See Whalen v. United States*, 445 U.S. 684, 692, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980). So, where two separate statutory provisions are involved, we determine whether there actually is only one offense by applying the separate-elements test: Where all of the elements of one are included within the elements of the other, the first is multiplicious with the second. *United States v. Teters, supra; see also United States v. Foster*, 40 MJ 140 (CMA 1994) (elements in one offense that are legally less serious than elements of the other offense are included within the latter). Otherwise, however, the assumption is that Congress intended that the violation of each statutory provision be separately charged and punished.

11. But what about the situation in which the *same* statutory provision is the basis of *both* charged crimes? Chief Judge Dixon concluded that, in such a case, "there is no assumption that more than one offense is being created." Instead, he reasoned that then "[a]ppellate courts are left to determine the intent of Congress by examining the societal interest the statute seeks to protect." 38 MJ at 631.

12. As a general approach, this seems like right thinking. It reflects the same logic that is implicit in the Supreme Court's quotation, in a different context, of the following passage from 1 J. Bishop, *New Criminal Procedure* § 436 at 355–56 (2d ed. 1913) (footnotes omitted):

A statute often makes punishable the doing of one thing *or* another, ... sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction, a person who in one transaction does all, violates the statute but once, and incurs only one penalty. Yet he violates it equally by doing one of the

---

2. *Compare* the official version of this rule, 284 U.S. 299, 304 (1932), *with* the version in 52 S.Ct. 180, 182, and 76 L.Ed. 306, 309.

things. Therefore the indictment on such a statute may allege, in a single count, that the defendant did as many of the forbidden things as the pleader chooses, employing the conjunction *and* where the statute has "or," and it will not be double, and it will be established at the trial by proof of any one of them.

*Griffin v. United States,* 502 U.S. 46, 51, 112 S.Ct. 466, 470, 116 L.Ed.2d 371 (1991).

█ 13. While sound as a *general* approach, however, it is not ineluctably correct in any *particular* circumstance, and we believe this is one in which it is not. At common law, there were two separate and distinct crimes of forgery (that is, falsely making or altering a writing) and uttering a falsely made or altered writing. In enacting Article 123, Congress "combine[d]" these common-law crimes into one statute defined as forgery. Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 1233 (1949). This consolidation within one statutory provision of what historically had been seen as two separate crimes, however, does not compel the conclusion that Congress meant to obliterate the distinction, and we have found no expression of intent to do so.

14. Indeed, in crafting this provision, Congress took care to write two substantively distinct subsections: The first subsection is aimed at someone who "falsely makes or alters" a writing, while the second subsection is focused on someone who knowingly "utters, offers, issues, or transfers" a falsely made or altered writing. Thus, one subsection addresses what someone might do to the face of a writing (regardless whether anyone subsequently uses the writing in any way), and the other turns to how one might use a falsely made writing (regardless whether that same person was the one who falsely made it). Each of these specific subsections, then, lists alternative ways by which forgery might be accomplished.

15. This carefully organized structure of Article 123—which, on its face, separately proscribes various alternative ways to do two qualitatively distinct acts—would seem to re-

flect a congressional intent to perpetuate the common-law approach of two offenses but simply to place their prohibition within one statutory provision for convenience. Thus viewed, the statute does not set out *alternative* ways to commit forgery, in the sense of having to choose; rather, it specifies two conceptually distinct and *different* ways to commit forgery so that, in a given factual context, one or the other or both might be violated. *See also United States v. Richardson,* 582 F.2d 968 (5th Cir.1978) (separate convictions for falsely making or altering a writing and for uttering that forged writing, both proscribed by 18 USC § 495); *cf. United States v. Sebastian,* 562 F.2d 211 (2d Cir.1977) (compares different elements of forgery and uttering under 18 USC §§ 472 and 495 for double-jeopardy purposes).

16. Having so construed Congress' intent to perpetuate two different offenses, both now denominated "forgery," we may answer the question of their possible multiplicity in the same manner as though they were proscribed under different statutory provisions. Against the separate-elements standard of *Teters,* we are of the same view as was the Court, answering the same question regarding the same offenses in *United States v. Gibbons,* 11 USCMA 246, 247–48, 29 CMR 62, 63–64 (1960). There, after noting that "the accused could have forged the check without uttering it and conversely he could have negotiated it without having forged the instrument," the Court quoted a lengthy passage from *United States v. McClary,* 10 USCMA 147, 27 CMR 221 (1959), and concluded: "Applying the principle set out above to the facts of this case, we find that here there were two separate criminal acts committed at different times and involving separate elements and different criminal intents." *Cf. United States v. Sebastian, supra.*

## III

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.